**LANDIS AND STAEFA (UK) LIMITED f/k/a Landis & GYR Limited, Plaintiff,**

v.

**FLAIR INTERNATIONAL CORPORATION, Defendant.**

**No. CV 97–5939(ADS).**

United States District Court, E.D. New York.

Aug. 12, 1999.

Law Offices of Mark R. Crosby, New York City, by Mark R. Crosby, of counsel, for plaintiff.

Jamie E. Frank, Kings Park, NY, for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This is a contract action between a British company, the plaintiff Landis and Staefa Limited (the "plaintiff" or "Landis"), which, for a period of time, purchased for resale motorized heating valves, also known as mid-position valves, from the defendant Flair International Corporation (the "defendant" or "Flair"). Landis manufactures and resells heating and air conditioning control equipment. A claim was made against the plaintiff for patent infringement involving valves, based on a United Kingdom ("UK") patent, by Honeywell Limited and Honeywell Control Systems Limited (collectively "Honeywell"). The plaintiff settled that claim for the sum of £ 660,000. Of that amount, the plaintiff states that roughly one third of the settlement figure involved Flair valves.

Landis contends that a written contract existed between it and Flair. According to Landis, this contract contained a provision that Flair will indemnify Landis against any claim of patent infringement with regard to the valves sold to it by Flair. This lawsuit was brought to recover the amount of the settlement sum paid by Landis to Honeywell involving the Flair valves, which is approximately the sum of £ 220,000, in addition to legal fees and costs.

The amended complaint contains two causes of action. The first cause is for contractual indemnification based on the alleged written contract. The second cause is for "implied indemnification" under the provisions of the New York Uniform Commercial Code ("UCC"), namely, the obligation to deliver the valves "free of the rightful claim of any third person by way of infringement." (*See* UCC § 2–312[3]) (the "UCC cause of action").

As to the first cause of action, Flair denies that it entered into any written contract. With regard to the UCC cause of action, Flair contends that there was an express exclusion of any warranty by clear language on its documents, pursuant to the provisions of UCC § 2–316, so that it has no liability for any U.K. patent infringement claim. In addition, the defendant contends that the valves were sold "FOB" the defendant's plant or "FOB" Hauppauge or "FOB" the Port of New York, so that title changed in New York. Under these circumstances, there being no United States patent claim, Flair contends that there would be no infringement of the U.K. patent. Flair, therefore, disclaims any responsibility to Landis in any manner under either cause of action.

Initially, the Court takes note of an unusual situation that arose in this case. Jamie E. Frank ("Frank"), the attorney for defendant Flair, is the sole stockholder of Flair. Also, Frank was the key Flair executive in the negotiation of the valve transaction between the parties. Thus, Frank is a key witness in this case. In letters dated April 30, 1998 and June 5, 1998, the plaintiff's counsel moved before United States Magistrate Judge Michael L. Orenstein to disqualify Frank as counsel for Flair. In an order dated July 17, 1998, Judge Orenstein denied the application without prejudice, and with leave to renew after the depositions of Rita Paleschuck and Susan Nicoletti were completed and after Frank certified that he will not be a witness in this action. By certificate dated July 28, 1998, Frank certified "that he will not act as a witness at the trial of this action."

During the trial, the Court, on is own initiative, raised this conflict as to Frank's representation of Flair. It was explained by Frank that: (1) Flair was a family business operated by him and his mother Rita Paleschuck; (2) the business and corporation is defunct and no longer operating; (3) he agreed not to testify; and (4) if he was removed as attorney, the corporation would not be represented by counsel.

In response to the Court's inquiry on the subject of disqualification, Frank submitted an affirmation dated July 7, 1999, which stated the following:

1) I own directly or indirectly, and I control all of the voting shares of stock in Flair International Corporation.

2) The corporation is neither a parent or a subsidiary of any other corporation.

3) The corporation is insolvent.

4) I closed down the operation and terminated all employees in June of 1997, in order to stop the losses.

5) At that time the corporation vacated its leased premises.

6) The corporation has not done any business since 1997.

7) The corporation has no assets of any kind, including no bank accounts, deposits, securities, land, buildings, inventory, machinery, equipment or accounts receivable.

8) The corporation has no possible means of hiring counsel to represent its interest.

9) I personally paid the out of pocket costs of this action, although I had no legal obligation to do so.

10) The corporation still exists as a legal entity; it not yet been dissolved primarily because it cannot complete the tasks necessary as a prerequisite to dissolution.

11) It is my intention to dissolve the corporation upon obtaining proper authority to do so.

The Court is aware that, in the Federal Court, ordinarily, a corporation cannot act *pro se*. *See Pridgen v. Andresen,* 113 F.3d 391, 393 (2d Cir.1997); *Eagle Associates v. Bank of Montreal,* 926 F.2d 1305, 1308 (2d Cir.1991); *Shapiro, Bernstein & Co. v. Continental Record Co.,* 386 F.2d 426, 427 (2d Cir.1967). In view of this situation, coupled with the absence of a further motion by the plaintiff to disqualify Frank, the Court permitted him to remain as Flair's counsel. However, the Court denied Frank's application to testify at the trial, based on his prior certification stating that he would not testify as a witness in this case.

## I. THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Rosen v. Siegel,* 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make the necessary findings of fact.

### A. *First Cause of Action—Was There a Valid Written Contract?*

The plaintiff contends that there was in existence a written contract (Plf.Ex.4). As to duration, this agreement stated that it was "for the period July 1, 1989 to June 30, 1990, and thereafter by mutual agreement." The contract was dated: "Agreed this _____ day of May, 1989," was unsigned by Landis, and, as to Flair, it appears to be signed by "JGB Stiles." The second page of the contract appears as follows:

Agreed this _____ day of May, 1989.
LANDIS & GYR LIMITED
By: _____

FLAIR INTERNATIONAL CORPORATION
By: _____
                    JGB Stiles

Alan Mac Hardie, the Landis Product Development Manager, related the facts concerning Flair's supply of valves to Landis and the Honeywell patent infringement claim. With regard to the alleged written agreement, Mac Hardie testified that he found a "copy" in April 1996 by searching in an old company archive area. Significantly, Mac Hardie testified that he never saw the original contract and did not know if it ever existed. Further, Mac Hardie was not aware of anyone in the company who actually saw the original contract. At trial, the plaintiff entered in evidence Plf. Ex. 4, what purported to be the "contract" between the parties. This document consists of two pages titled "agreement," together with eight annexed documents. Mac Hardie did not recall whether these documents were actually annexed to the "agreement" when he found it. Mac Har-

die stated that he looked for the original contract for one month and in 200 or 300 boxes of records.

According to Mac Hardie, the signature on the contract appeared to be "J.G.B. Stiles." He stated, however, that he did not know if the signature was that of John Stiles, a representative of Flair. Mac Hardie further testified that he met John Stiles once at the Landis office. He candidly conceded that he could not conclude that Stiles could bind Flair. According to Mac Hardie, Stiles was the U.K. agent or "an arm" of Flair; who was involved in the initial discussion with regard to the supply of valves to Landis.

Mac Hardie was shown various faxed documents signed "John Stiles." He recognized the "John Stiles" signature as one he has seen. He stated that the signature on the faxed documents "has some similarity" to the signature on the alleged "agreement." However, Mac Hardie conceded that this was the only time he saw the signature written as "J.G.B. Stiles." On all other documents it appeared as "John Stiles."

Even though Mac Hardie testified that the "agreement" was the basis for the supply of valves by Flair to Landis, he stated in a deposition that "purchase orders" were the basis for the transactions. The Court finds that, more likely than not, the parties did business on the basis of the Landis purchase orders and the follow-up Flair documents, rather than this "agreement" found in the archives in April 1996, after a one-month search of more than 200 boxes of records.

The Court notes that the duration of the alleged "agreement" is from July 1, 1989 to June 30, 1990 "and thereafter by mutual agreement." Mac Hardie had no knowledge of any other document which extended the original "agreement." Even assuming, for the purpose of this discussion, that the original "agreement" was valid, the Court finds that the plaintiff failed to prove it was extended "by mutual agreement" after June 30, 1990.

Melvin Green was formerly employed by Landis for 17 years and was Distribution Manager from 1988 to October 1993. He was present at meetings held in the spring of 1989 between Landis representatives and John Stiles on behalf of Flair. The discussions concerned quantity, prices and deliveries of the Flair mid-position valves. A second meeting in the U.K. involved Jamie Frank and Stiles on behalf of Flair. At that meeting the prices and other details were finally agreed upon. Green stated that Landis requested indemnity for any patent and copyright infringements.

Green testified that an oral agreement was reached by the parties and a written agreement was prepared which included details such as the transactions being FOB N.Y. Port, indemnity provisions, prices and the first year's delivery of 40,000 valves. According to Green, Frank stated that he had "no problem" with furnishing an indemnification to Landis, because of Flair's previous transactions involving its valves in the U.K. However, Green stated that there were no further discussions with Frank by him or anyone at Landis with regard to indemnification. Based on the totality of the evidence, the Court does not credit this testimony, and finds that, at no time did Frank orally agree that Flair would indemnify Landis for any future U.K. patent infringement claims.

Green further testified that a week after this meeting an agreement was prepared. The Court notes that there was no evidence adduced as to who prepared the agreement or how it was delivered to Flair for signature. Shown the alleged "agreement," Green identified the signature of John Stiles. Green first met John Stiles early in 1989 and saw him at least once a month until 1993. He testified that he corresponded with Stiles every week and recognized his signature. Green's "impression" was that Stiles worked for Flair. Stiles used Flair's stationery; gave Landis instructions on behalf of Flair; and acted on behalf of Flair in the U.K. with regard

to all transactions. Green "believed" that Stiles was an employee of Flair and had the authority to bind it to the agreement at issue. He stated that nothing done by Flair indicated that Stiles did not have the authority to bind Flair. However, he never saw any document or any other indication as to the relationship between Stiles and Flair. In addition, no one at Flair ever advised him that Stiles was authorized to act on its behalf. Moreover, Green could not recall that Stiles ever actually advised him that he was a consultant for Flair. Significantly, Green also testified that "he did not recall" if Stiles told him that he had no authority to act for Flair.

Green identified the first three purchase orders from Landis (Def.Ex. B), dated April 17, 1989 marked "F.O.B.U.S. Port June 1989." Thereafter, the purchase orders were delivered by Fax from Landis employee Janie Meredith. The Court notes that these three purchase orders were dated on April 17, 1989, prior to the initial date in the alleged "agreement," which was July 1, 1989.

As to the alleged "agreement," Green testified that the copy in evidence (Plf.Ex.4) signed by "JGB Stiles" was the only one he had ever seen. Green kept the "agreement" in his Flair file, and referred to the agreement with regard to prices and the warranty period. Although the "agreement" terminated on June 30, 1990, Green stated that it did not end at that date, and continued at least until he left the company in 1993. However, Green knew of no written agreement that extended the termination date of June 30, 1990.

The Court notes that several documents were introduced in evidence to demonstrate the signature of John Stiles. In documents introduced as Plf.Exs. 11 and 14 and Def.Ex. D, the signature appears as "John Stiles," while in the alleged "agreement" at issue, the signature appears as "JGB Stiles," although the signatures look somewhat similar. Furthermore, Green testified that Stiles "normally" signed his name as "John" or "John Stiles" and not as "JGB Stiles." There is also in evidence a copy of the alleged "agreement" which is changed by handwriting (Def.Ex. C). Green had no idea where this copy came from or who changed the terms of the agreement in handwriting. Green did not know why Landis never signed any version of the alleged "agreement."

Robin Varekamp, a Dutch lawyer associated with a parent or related company of Landis, testified with regard to the Honeywell patent infringement claim and the reasonableness of the settlement by Landis. As a result of the Court's determinations in this memorandum decision, the Court need not address this issue. However, Varekamp conceded that Flair consistently denied responsibility for any patent infringement and refused to participate in any settlement negotiation with Honeywell.

In the defendant's case, Rita Paleschuck testified that she is the mother of Jamie Frank, and Vice President of Operations of Flair in charge of sales, purchasing, shipping and marketing. Prior to 1987, Paleschuck was Chairman and President of the company. She testified that Stiles was a consultant to Flair, who was employed and paid on a daily basis; he had no commission agreement with Flair and averaged one working day per month for Flair; Stiles was not an officer, director, or even a regular employee of the company; his job was to introduce Flair to potential customers; Stiles was multilingual and he was to meet customers in the U.K. (and Europe) and "convey Flair's thoughts to them;" Stiles "had no full knowledge of what was going on;" and that Stiles made no decisions for Flair.

Paleschuck corresponded with Stiles on many occasions and testified that she was familiar with his handwriting and signature. She stated that he never signed his name as JGB Stiles; always as John Stiles or J. Stiles. Even though she was equivocal in a deposition, Paleschuck testified at

the trial that the "JGB Stiles" signature on the alleged "agreement" (Plf.Ex.4) was not the signature of John Stiles. In doing so, she did identify several documents that did contain the genuine Stiles signature (Plf.Exs. 11 and 14, and Def.Ex. D). The Court credits this testimony by Rita Paleschuck and finds that the alleged "agreement" upon which the plaintiff's first cause of action is based, was not signed by John Stiles or from anyone on behalf of Flair.

Paleschuck attended a meeting with a Landis representative in the United States. Landis agreed to the terms of FOB Port of New York and FOB plaintiff's plant. She stated that these terms meant that the customer was to take title in the United States, so that Flair could avoid foreign laws and minimize the risks of transportation.

As to indemnification, Paleschuck testified unequivocally that "under no condition would we agree to do that." Apparently, Flair had a prior "costly" experience with indemnification and did not want a similar problem. Paleschuck testified that she never saw the alleged "agreement" prior to the time it was made a part of the lawsuit, nor did she ever instruct Stiles to sign the alleged "agreement." Paleschuck maintained a "contract file" in her office, which contained copies of all Flair agreements. There was no Landis agreement in her file; there was no reference to a written "agreement" in the Flair records; nor were there any conversations concerning such a written agreement. Further, according to Paleschuck, there were no discussions or correspondence concerning a renewal or extension of any written agreement.

After several meetings Flair prepared a price "quotation" for Landis, which appeared as a "schedule" in the alleged "agreement." Although Flair referred to an "agreement" in several documents, the use of that term is unclear, and the Court finds that the plaintiff failed to prove that this reference was to the alleged written "agreement," which is the basis of the plaintiff's first cause of action.

As to the whereabouts of Stiles, Paleschuck testified that she "thinks" he resides in Australia. However, she conceded that she did not make any efforts to locate or contact him.

Susan Nicoletti was an employee of Flair for 17 years. During the years at issue in this case, she was the Accounting Manager and Office Manager. Her duties included complete supervision of the Flair books and records, the handling of money and signing checks. Nicoletti testified that Stiles was paid on a per diem plus expenses basis. She stated that she knew little about his responsibilities but that he was in the "sales area." Further, she was not aware of any decision that Stiles made for Flair. Flair never withheld any payroll taxes on Stiles' compensation and filed no W2 forms for him.

Nicoletti was shown the alleged "agreement" (Plf.Ex.4). She stated that she was familiar with Stiles' signature and that the signature "doesn't look familiar at all," "looks totally different from the others," and is not his signature. Nicoletti testified that she has no knowledge of the alleged "agreement" and never saw it prior to the commencement of this lawsuit. No such document was in the Flair contract file. The Court notes that her testimony with regard to her knowledge of the Stiles signature was different from her deposition testimony.

The final witness at the trial was plaintiff's rebuttal witness Janie Meredith, a former Landis employee. During the time at issue in this case, she was a Logistics Manager and Commercial Analyst for Landis. Surprisingly, Meredith testified that she first saw the alleged "agreement" in April 1999. She has "no memory that this agreement ever existed." Nor was she aware of any express extension of the "agreement." Meredith stated that she was not familiar with the Stiles signature. She testified that Landis operated under the terms of the "agreement," but also

stated that she could have learned of these terms from sources other than the "agreement." Meredith also conceded that Landis "could have done business with Flair without an express written agreement." There was no company rule that a written agreement was necessary to do the kind of transactions at issue in this case. While Meredith "presumed" that the original contract terms continued to 1993, she admitted that the prices and quantities and terms of payment changed and the FOB terms varied during the period the parties did business together.

Finally, Flair placed in evidence certain Landis responses to "Requests for Admissions," dated December 29, 1998 (Def.Ex.J). Among the admissions by Landis were the following:

29. Landis received a hard copy invoice by mail, for each order it placed with Flair for valves.

33. Flair invoices contained a set of terms and conditions on the back.

As to request for admission No. 59, the following answer was made by Landis:

59. The document attached to the plaintiff's complaint, entitled "Agreement" was never signed by Landis.

RESPONSE: Plaintiff having made a reasonable inquiry, does not possess sufficient knowledge or information to admit or deny this request for admission.

The Court finds that the plaintiff Landis failed to prove, by a preponderance of the credible evidence, that the alleged written agreement (Plf.Ex.4) was signed by a representative of the defendant Flair, namely, John Stiles. Therefore, no valid written agreement was entered into by the parties.

In addition to the substantial evidence adduced that Stiles did not sign the alleged "agreement," the Court takes note that there was no proof offered by the plaintiff that any one saw the agreement being signed. There is no covering letter or memorandum from Landis or Flair presenting the agreement to be signed or delivering the signed agreement. No attorney or any representative of Landis testified that they prepared the agreement. Apparently, no Landis employee ever saw the signed 1989 "agreement" until 1996.

The Court also finds that the plaintiff Landis failed to prove that, even assuming that the agreement was valid, it was extended after June 30, 1990 by any "mutual agreement." Stated otherwise, even if signed by an authorized representative of Flair, the written agreement would have expired on June 30, 1990.

■ In addition, the Court finds that the plaintiff failed to prove that John Stiles was authorized to enter into the alleged "agreement." There was no proof of any express authority on his part to do so. Nor did the plaintiff prove that Stiles had the "apparent authority" to bind Flair by signing the agreement. "Essential to the creation of apparent authority are words or conduct of the principal communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984); *Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980); *Ford v. Unity Hospital*, 32 N.Y.2d 464, 472–473, 346 N.Y.S.2d 238, 243–44, 299 N.E.2d 659 (1973). *See also Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551, 656 N.Y.S.2d 188, 191, 678 N.E.2d 874 (1997).

Stated otherwise, essential to a finding of apparent authority is some confirmatory conduct on the part of the principal. The agent cannot by his own acts clothe himself with apparent authority. *Reiss v. Gan S.A.*, 98 CV 8302(SAS), 1999 WL 553781 (S.D.N.Y. July 29, 1999). In this case, there is no evidence that Flair, in any manner, stated, indicated or even inferred that Stiles possessed the authority to bind it in a major agreement of this kind.

Thus, even if Stiles did sign the agreement, he had no authority to bind Flair.

The plaintiff has failed to prove that there was a valid written agreement between the parties. Accordingly, the first cause of action, based on such an agreement, is dismissed.

### B. *Second Cause of Action—Was There Implied Indemnification Under the Terms of the UCC?*

■ The Court finds that as to each shipment of valves, Flair sent documents known as "orders of acknowledgment" and invoices to Landis. Paleschuck explained the type of forms used in the Flair–Landis transaction. The forms consisted of (1) an order acknowledgment, front and back; (2) a packing list, front and back; and (3) an invoice, front and back. These types of forms are in evidence as Def.Ex. A. The document containing the words "order acknowledgment" has on its face, at the bottom, the following words:

#### TERMS AND CONDITIONS

The prices listed here are in consideration of the terms of this contract as stated on the reverse. Read all terms and conditions on face and reverse side. Only such instructions, terms and conditions shall constitute the contract between the parties.

On the reverse side of the order acknowledgment in large and darker type appears the following disclaimer:

#### LIMITED WARRANTY

1. There are no warranties, expressed or implied, written or oral, including but not limited to any implied warranty of merchantability or fitness for use or for a particular purpose, with respect to any device manufactured or sold by Flair, except as herein set forth.

A sample of an invoice is dated September 16, 1993 (Plf.Ex.9). On the reverse side of the invoices are printed terms and conditions headed by the words "Limited Warranty." The first limitation is in bold print and states:

A. There are no warranties, expressed or implied, written or oral, including but not limited to any implied warranty of merchantability, or fitness for use or for a particular purpose, with respect to any device manufactured or sold by Flair, except as herein set forth.

Paleschuck testified that in the 1989 meeting with Landis and thereafter, there were no discussions of a Honeywell patent infringement problem. Further, she stated that if Flair knew anything about a possible patent infringement, it would have attempted to modify the valves or decline to sell the valves to Landis. The Court finds that this testimony to be credible.

Rebuttal witness Janie Meredith testified that on April 17, 1989, she faxed the first three purchase orders to Flair, which contained the notation "F.O.B. U.S. Port June 1989." She stated that she placed the Landis purchase orders with Paleschuck. Strangely, Meredith never saw the Flair order acknowledgment forms prior to April 1999. However, she testified that the Inventory Department typically would receive the Flair acknowledgments, and that she would see the acknowledgments. The Court notes this seemingly contradictory testimony. Instead of the Flair order acknowledgment forms (in evidence as Def.Ex. A), Meredith stated she received faxed, typed acknowledgments, such as Plf.Ex. 19 in evidence. However, Meredith conceded that she received invoices from Flair, such as Plf.Ex. 9 in evidence, on which is stated as shipping terms, "FOB Haup. Freight Collect." The Court notes that on the reverse side of the invoices, is the same language as on the reverse side of the order acknowledgment forms, as stated in larger and darker print, namely:

## LIMITED WARRANTY

1. There are no warranties, expressed or implied, written or oral, including but not limited to any implied warranty of merchantability or fitness for use or for a particular purpose, with respect to any device manufactured or sold by Flair, except as herein set forth.

The Court finds that the plaintiff Landis also failed to prove, by a preponderance of the credible evidence, that Flair was obligated to indemnity it under the terms of the UCC, for the patent infringement settlement sum it paid to Honeywell.

New York U.C.C. § 2–312(3) states as follows:

(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

The defendant Flair contends that there was an express exclusion of the warranties set forth in § 2–312(3), when it acted within the terms of New York UCC § 2–316, which provides as follows:

§ 2–316. Exclusion or Modification of Warranties

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

It is clear that a seller may, if it chooses, place the disclaimer language upon the reverse side of its documents, if it fairly discloses that fact to the purchaser. *See e.g., Gambardella v. G. Fox & Co.,* 716 F.2d 104, 111 (2d Cir.1983).

The defendant argues that its disclaimer is conspicuous, as required by UCC § 1–201(2), which states in part, as follows:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed. *** Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. *** Whether a term or clause is "conspicuous" or not is for decision by the court.

The term "conspicuous" was discussed in *Commercial Credit Corp. v. CYC Realty, Inc.,* 102 A.D.2d 970, 477 N.Y.S.2d 842, 844 (3d Dept.1984), as follows:

The test, accordingly, is whether a reasonable person would notice the disclaimer when its type is juxtaposed against the rest of the agreement (1 Anderson, Uniform Commercial Code [3d ed], §§ 1–201:54–1–201:58, pp 210–212). As the only boldface print in the only four paragraphs on the first page of the agreement, it cannot be said that the disclaimer did not call attention to itself. Further, it is under the broad heading of "TERMS AND CONDITIONS OF LEASE" and appears before the authorizing signatures on the front side of the agreement and not on the back with the boilerplate paragraphs. For these reasons, we find that Special Term erred in ruling the disclaimer not conspicuous (1 Anderson, Uniform Commercial Code [3d ed], 1–201:61, p 214). Accordingly,

summary judgment on the issue of liability should have been granted to plaintiff.

The issue as to whether the warrant disclaimer is "conspicuous" is close. The printed material on the front of the order of acknowledgment referring to the reverse side is not large or dark. However, based on the totality of the circumstances in this case, the Court finds that it is sufficient to alert this purchaser to look at the reverse side. The printed material on the reverse side stating that "[t]here are *no* warranties, express or implied, written or oral" (emphasis supplied) is lonarger and in darker print. Landis is a large corporation, experienced in purchasing heating equipment. The management personnel at Landis were, with reasonable certainty, not persons of "limited formal education," as referred to in *Sobiech v. International Staple & Machine Co.*, 867 F.2d 778, 782 (2d Cir.1989). The Landis personnel were sophisticated, knowledgeable, purchasers. The Court finds that, with reasonable certainty, they would examine both sides of the vital purchase documents in major sales transactions. The Court finds that the Landis "reasonable person" would, therefore, notice the disclaimer in all the key Flair sales documents.

The defendant also contends that title to the valves passed in the United States, where there was no Honeywell patent and could be no infringement chargeable to Flair. The first three orders from Landis, dated April 17, 1989 (Def.Ex.B), were all noted to be "Delivery Required—F.O.B. U.S. Port June 1989." The shipping terms on the invoices in evidence indicate "FOB Haup. Freight Collect" or "F.O.B. U.S. Port." Although Mac Hardie initially professed not to know the meaning of this term, he later stated that FOB means receiving the goods free on board at Hauppauge, and that Landis would have to pay for shipment to the U.K. In any event, Landis was to pay for delivery from the Flair factory in the United States to the Landis plant in the U.K. In view of the

Court's determination that Flair effectively disclaimed liability for the Honeywell patent infringement claim, the Court need not determine this potentially complex issue.

Accordingly, the Court finds that the defendant Flair proved, by a preponderance of the evidence, that pursuant to UCC § 2–316, it sufficiently disclaimed any liability to Landis for patent infringement claims. Therefore, the second cause of action is dismissed

## II. CONCLUSION

In that the plaintiff has failed to prove either of its causes of action it is hereby

**ORDERED,** that the complaint is dismissed in its entirety; and it is further *ORDERED,* that the Clerk of the Court is directed to close this case.

**SO ORDERED.**